Case number 14-7051, Greg Burley, Appellant, v. National Passenger Rail Corp., doing business as Amtrak. Mr. Carl for the Appellant, Mrs. Sakalakis for the Appellant's plea. Good morning, Your Honors. May it please the Court, Mr. Burley and Mr. Ebersole were subject to the same work rules. This case is about the selective application of those rules. If Burley had received a waiver in formal disposition of the charges against him, he wouldn't have been fired and we wouldn't be here. Now, there are two separate narratives in the record of why the locomotive derailed. Amtrak says that the African-American engineer, Mr. Burley, was solely responsible. This is what Pesce said he believed, and based on the documents prepared by Smith and reflecting Smith's testimony and the fact that he concealed the mitigating factors in his report, it certainly would appear that way. But what is not in the record is Ebersole's breach of his duty, the fact that he jumped off a moving locomotive, that it was Ebersole's job as the conductor to run the movement of the locomotive. Burley is driving the locomotive. He believes Ebersole is on the front of the locomotive. And when you compared the discipline imposed on the two employees, Ebersole was more experienced. He knew better. He was in charge of the movement of the engine. There were no lights, no blue lights displayed on the track, and Burley couldn't see the derail itself because of the curve. And, of course, he didn't know that Ebersole had jumped ship. Now, Ebersole testified as part of the investigation that was conducted by Amtrak that, in fact, the blue light was not working. When you consider the fact that Ebersole acted intentionally and Burley did not, the evidence does not support the disparate discipline that was imposed, particularly since Burley had been cleared by radio to go down the tracks. And he can stop his locomotive if and only if he knows that Burley is gone. So Burley is following – sorry, that Ebersole is gone. Burley is following directions. Ebersole is off the locomotive. Ebersole starts yelling at him, telling him that the derail was deployed. But this morning – So does Burley have an obligation under his training to know where every blue signal and every derailer is in this area and have anybody who's on a moving – I mean, I thought the rule was anybody who's on a moving train is responsible for it. He knew where the derail was. He believed that Ebersole was in the front of the locomotive directing his move. The blue light was not displayed, and so there was no reason for Burley to think or believe that the derail was still deployed and would derail his locomotive. This is not in the record, but I found it really bizarre. And when I think about this case, I don't understand why, you know, every new car these days has video cameras showing things that you can't see with your own eyes. They really have to rely on a live human being having to be on the front of the train in order to see where there are these signals or derails? Yes, Your Honor. And Ebersole was either supposed to be on the train or he was supposed to be on the ground between – Telling him. And he was shouting at him, but he couldn't be heard. I just find it mind-boggling. I mean, no, that's not the issue in this case, but I'm just trying to understand the circumstances. It seems mind-boggling that there's such a primitive system. And part of it is that's the reason why they had two conductors out there. They had conductor and assistant conductor, because if you look at the map of the railroad yard, you see the curve in the track. So Burleigh is not able to see. So the issue you're – I mean, you're describing a situation that may be – may seem a little random to us. It may not seem the best way to run a railroad. But your burden is to show that there was a terrible issue of discrimination. And I guess the question is where is there evidence that the reason for this what might be odd decision to treat Ebersole differently is in any way attributable to race? Well, first of all, no one admits or acknowledges being involved in giving Ebersole a waiver, but it appears that decision – the jury could find that decision was made by Mr. Smith. What's the evidence in the record that a jury would rely on for that, that Smith was involved in Ebersole's? I'm sorry, Your Honor? What's the evidence in the record that supports the notion that it was Smith who was involved in Ebersole's waiver? Because the people above him, Sherlock and Pesce, have no recollection. And the record shows that a decision like that is ordinarily made at the assistant superintendent or superintendent level. Or someone above. That's what he testified to. Or what's the big part? This guy, Ingley, is that his name? Is that the guy who testified? Ingley? Ingley, yes, Your Honor. What's his name? His name is Ingley. Ingley, yeah, right. He says – you're true, nobody knows what happened in this case – but he says that such decisions would normally be made by the assistant superintendent, quote, or someone above. Right? That's what he testified to. The assistant – Now, Smith was the assistant superintendent, but it could have been someone above Smith who did the – It could have been, except another questioner. Sherlock did say that they had any involvement in the decision to give a waiver to Ebersole. And if the decision for – to give Ebersole was a waiver was made at Smith's level, then it certainly occurs likely, given what Smith knew, that he was involved in the decision to deny a waiver to Burleigh. And when I talk in terms of what Smith knew, Smith knew that Ebersole stated that the blue light was not deployed. Now, Smith goes to the scene of the derailment and says that the blue light was flashing and that the blue light was properly displayed. This is the court says is not supported by substantial evidence, and the – you know, the law of the circuit is that when a decision is not supported by substantial evidence, there's almost nothing there. The court can rarely make that finding. And what he – what Mr. Smith did is he said that the light was deployed even though he was not at the scene of the had said that the blue light was out. And thirdly, just in terms of the circumstantial evidence, if the locomotive had hit the blue light that was properly destroyed, the locomotive would have destroyed that blue light. And if you look at what Smith knew about what Ebersole actually did, you look at the charging papers, the notice of the four charges against Ebersole, it's clear that Smith knew that Ebersole dismounted from the locomotive or jumped off the locomotive. And that's the reason why he was not in a position to assist the engineer. And so there are really two separate versions of what happened here. There's the version that Smith spun – that Smith described in which he omitted critical information, including the reason why Ebersole was not in a position to help Mr. Burleigh. But secondly, he omitted other mitigating factors, other exculpatory information. So if you look at that first report, Your Honor, it looks like the derailment was solely Burleigh's fault. But there is other evidence, including the fact that Ebersole said the light wasn't working, including the fact that Ebersole abandoned the ship and left Burleigh in charge, including the fact that Ebersole didn't tell Burleigh that he was going to jump off or dismount from the locomotive, that a reasonable jury could find that, well, no, it wasn't solely Burleigh's fault that Ebersole was at least as responsible for the derailment as Mr. Burleigh was, and that was information that, including the mitigating factors that Smith concealed from the people who ultimately reviewed the decision in the report. And when you look at the transcript, for example, of the investigative hearing, well, the Amtrak employees conducting the hearing refuses to consider, refuses to hear any claim of disparate discipline. He refuses to consider any of the circumstances that suggested, and we think certainly strongly suggested, that Ebersole was responsible for the derailment. He refused to allow those matters to be the subject of testimony at the hearing. And so you have a hearing where Mr. Smith has got a report, and what he's essentially doing is reading large portions of the report into the record, including the funny, I thought kind of quaint terminology, well, Ebersole, the conductor, was not in a position to help Burleigh. Well, that just begs the question of why he wasn't in a position to help Burleigh. And the answer to that, and the evidence shows, he wasn't in a position to help Burleigh because he secretly abandoned ship without telling him. Is there any rule that requires that conductor to stay on the train? No, the rule is that you either have to be on the front of the locomotive, or you've got to be walking ahead of the locomotive. And wasn't he walking ahead of Burleigh? He was walking ahead, but he was walking ahead on Burleigh's blind side. And his job under the Amtrak, the NORAC rules, is that he's got to be in a position where he can work He wasn't disciplined for that, and Amtrak didn't consider him to be out of place in that respect. Well, he was out of place. This is what he was charged with. Being off the train. More importantly, not being in a position to help. But this was one of the charges that was assumed within the waiver, the guilty plea, if you like, to which Mr. Ebersole signed off. Was there evidence other than Burleigh's interest in a waiver that he did accept responsibility? He went to his union representative, his union representative met with Bingley, his union representative met with Sherlock in order to get the waiver, and the answer was, we're not going to talk to you about that. But I guess my question was, was there evidence that he accepted responsibility? I mean, he wanted the benefit of a waiver, but did he sort of in any way say, I messed up, Buck stopped with me, I'm responsible? Because I think part of the defense argument here is that Ebersole really came forward and accepted responsibility in a way that Burleigh didn't. Well, there are two responses. Number one is this is part of the standard waiver process. I accept responsibility. I am guilty of these charges. So it is a guilty plea. But the other part is that the district court summary judgment analysis is based on testimony from Pesch and from Sherlock about what they would have done. But Amtrak does not have any evidence whatsoever as to who is the decision maker. And since neither Pesch nor Sherlock remember being involved in the decision, their testimony five years later about what they would have done in 2007 certainly has no probative value. But perhaps even more importantly than that for the purpose of assessing what was really going on here is they didn't know that Ebersole had gotten a waiver. They didn't know that Ebersole had jumped off the train. They didn't know that Ebersole had told Smith in a recorded interview taken approximately an hour after the derailment, they didn't know that Ebersole said that the blue light was out. Can you tell me, you had mentioned that Mr. Ebersole was disciplined for being off the train. Can you just remind me where in the record or point to me where in the record that is that he was actually disciplined for being off the train? Your Honor, it is plaintiff's exhibit, I think, number one or number two. And it's right in the first or second exhibit following the plaintiff's statement of material facts. And so that precise page is going to be, it's called Amtrak's charging letter to Ebersole. And it's at page 322, Ebersole's waiver is at 323, and there is attached to that a corrected version of the Amtrak charging letter to Ebersole. The charging letter, Amtrak's charging letter to Ebersole is two pages, and that's why the corrected version was filed. And the second page lists the specific charge against Ebersole that demonstrates that those involved knew specifically what happened. The wording is important because the specification about the charge against Ebersole for jumping off the train says further, this action contributed to the derailment in that you were not in the cab of the locomotive to notify your engineer. Right, so you're on 327, is that right? Beg your pardon? 327, is that right? 327, yes. Okay, thanks. And the, you know, in terms of what actually happened as opposed to what Mr. Smith has said, you know, there's a jury question there. What we have here is a situation like, I think perhaps like Parliament or Solomon case where the judge is making findings of fact. He says I find it's reasonable to find Smith credible. Well, we submit that's a jury issue, that there was substantial evidence to support Smith's testimony that the blue light was properly displayed. Smith wasn't there and it's inconsistent with whatever was told to him. And thirdly, that it really deserved to be denied a waiver. Mr. Paul, can you just really quickly address the spoliation issue? And, you know, just succinctly, what is the basis for believing that it wasn't just they have some tapes and they flush them as a routine matter, but that somebody actually had a duty to preserve it and didn't? Well, Your Honor, part of this is an element of the timeline. I mean, they take the tapes and they record, this is a motion detector, and they record what happens in the yard and they record what happens in order to properly investigate an accident. And the derailment was on October 20th. Adler, the union rep, asked for the video on October 26th. And it's never, I'm sorry, Adler asked for the video on October 29th, the Monday, or nine days after the accident. And there was no dispute below as to whether or not the tapes actually existed. There's testimony in the, for example, in the Kavanaugh deposition, it's appendix pages 421 through 426, about the reason why they had these particular tapes and why they were taping it. And the whole premise of having this taping system is in order to investigate if there's an accident. And so our argument with respect to the spoliation is really twofold. Number one, if, and this goes back to the business judgment rule, if Smith was really serious about finding out whether or not the blue light was properly displayed, he would have looked at the tapes. And secondly, the fact that he didn't look at the tapes and Runkle said the tapes were destroyed certainly would support the inference by a jury that in fact they knew about Runkle. He was, well, the discussions between Adler and Runkle, and Adler includes this in his declaration. Right, but there's nothing from Runkle's, because it seems like if you really want to press this as a spoliation issue, you would have had something from Runkle saying, tape destroyed. It's a little hearsay, right? Your Honor, we submit specifically excluded from the hearsay rule under 801D2. And for example, the decision that Judge Kavanaugh was on a case called English versus D.C. lays out specific requirements as to what is hearsay and what's not. And it seems that it's perhaps under Talavera and under English that it's certainly not hearsay and that we satisfy the requirements by showing that Runkle could make this statement within the scope of his employment that it was related to his duties. Runkle was the guy in charge of the room where they kept the video equipment. And he doesn't have to show, the plaintiff does not have to show that Runkle was involved in any way in the employment decision. But where Amtrak comes in and says, well, you know, we've got this business judgment rule and we did this thorough investigation, it's one of more than a half a dozen pieces of evidence showing that that's not true, that there was no serious investigation, that Smith really wanted to know whether the light was on instead of going to the scene of the derailment and looking at the scene of the derailment when he wasn't there at the time certainly does not fulfill the duty of creating or doing a thorough investigation. If he wanted to know, the answer is no. And the same is true, I believe, of the video. You're well over your time. Thanks. Thank you. Good morning, Your Honors, and may it please the Court, Andrew Sackler here of Amtrak. I want to take you back. In October of 2007, Mr. Burleigh was alone on an engine. He alone pushed that engine forward over an applied derail and derailed his train. And Amtrak conducted a full and thorough investigation. And my colleague on the other side is pointing to Smith and attempting to create the impression that Mr. Smith was the sole investigation of this derailment. But that is absolutely not true. According to Mr. Burleigh's collective bargaining agreement, Amtrak had to offer him a full evidentiary hearing, something that Amtrak's transportation department. And at that hearing, Mr. Burleigh was represented by his union. He was able to testify on his own behalf. He was able to present whatever evidence he liked. He was able to cross-examine Amtrak's witnesses. And the hearing officer, examining all of the evidence, found that Mr. Burleigh was responsible for the derailment and crossed the blue signal, and by doing so, violated one of the most egregious rules that an engineer can violate. But Mr. Secularis, didn't the hearing officer rely substantially on Smith's report at the time? Wasn't that the main, really significant piece of evidence in that hearing? Your Honor, we will not deny that Mr. Smith was a significant witness in the hearing. But there were many witnesses, including Mr. Burleigh himself. His report doesn't even talk about Ebersole's involvement in Smith's report. So it's, I mean, there are some gaps that your opposing counsel has pointed to, that Smith is giving a report, and it's not complete. He's not doing the diligence that one would expect to do if one really wanted to get to the bottom of things. He didn't look at the tape. He gives a report that doesn't explain that. Ebersole was supposed to be on the front of the engine, and he jumped off without saying anything. And this is pretty mitigating for Mr. Burleigh, but it's not in that report. Well, your Honor, and I would agree with you if this one-page document that's about seven sentences long were in fact the investigation. But there was an entire hearing that included Mr. Ebersole was a witness, Mr. Burleigh was a witness, Mr. Smith was a witness, and Mr. Burleigh's union rep was able to cross-examine all of these people. So all of these supposed mitigating facts, where Ebersole was at the time, where Mr. Burleigh was at the time, the fact that Mr. Burleigh couldn't see the derail, all of this evidence about sort of what lights were blinking and what lights were not blinking, all of this was covered in the hearing. Because it wasn't Mr. Smith's job to perform the investigation. That was the role of the hearing officer. Amtrak could not discipline Mr. Burleigh based on Mr. Smith's one-page report alone. We submit that there was a 180-page transcript with exhibits and documents, cross-examination. That, in fact, was the investigation here. And I think more importantly, this is a race discrimination case. This is not an arbitration over whether Mr. Burleigh did in fact derail the engine. And largely, the facts of that, even the derailment, are not necessarily in dispute. There's no dispute that Mr. Burleigh's 120-ton train was off the tracks. And there's no dispute that Mr. Ebersole was not on the train at the time of the derailment. And there's no evidence in the record that Mr. Ebersole was required to be on the train. In fact, the very rule... I thought he was required to be on the train. You dispute that, that Amtrak doesn't require the conductor to be on the train. No, Your Honor. In fact, engineers are... I'm sorry, conductors are frequently not on the train. This is not... Not on the train or in a place where he's in the line of sight and can warn the engineer if they're coming up on a blue signal. Well, Your Honor, it's interesting that you mention that because the very rule that requires someone to be in the line of sight also requires an engineer. If they don't have visual contact with the person that's supposed to be guiding them, they're not permitted to travel forward. Well, they're either supposed to be on the engine, in which case I think they wouldn't be visible, or be off and in the line of sight. Isn't that... Is that not right? Well, I don't think the record supports that that is a hard and fast requirement because there are frequently... And in fact, I think I was pointing to a place in the record where Ebersole was disciplined because he wasn't where he was supposed to be. And you're saying that Amtrak doesn't require that, but they disciplined him anyway? Well, the record isn't clear as to whether he was actually required to be there, but you are absolutely right that he did receive discipline, but it's... For not being where he was supposed to be at the time of the derailment. That does appear to be why he was disciplined, but, Your Honor, it's undisputed that Mr. Burley and Mr. Burley alone was the only person who could have pushed that train forward. And again, my point here is that this is not... What is before the court and what would be before the jury is not whether Amtrak was right or wrong in this decision. I understand that. It's a racial discrimination case and he has to show that the reason that he was treated differently and not given a waiver and discharge was because of his race, but he's trying to rely on circumstantial evidence. What about this foliation issue? What is the records retention or video policy that Amtrak employs in this yard? Why was that video, A, not consulted and, B, destroyed? Well, Your Honor, first and foremost, there is absolutely no record evidence that there was ever a videotape of this. There was no mention of a videotape in this case until we received the other side's opposition to our summary judgment. And so... Didn't someone testify in the deposition that it was destroyed? No, Your Honor. The only mention of a video being destroyed came in Carl Edler's declaration. Now, he provides his declaration five years later. He doesn't give any detail that would indicate that there ever was a video. What about Ronkel? Isn't Ronkel a guy who runs the video system? He says Ronkel destroyed it. Your Honor, I don't believe he said... Didn't he tell that he told the union... Oh, this is the union representative's affidavit, right? Correct. He was told by Ronkel, right, that Amtrak had erased the tape. He claimed that he was told by Ronkel that the tape was destroyed. I don't think Ronkel said that he personally destroyed that tape. No, I said... No, that it was destroyed. I didn't say that. He says he used the passive. It was destroyed. It was erased. That does appear in Mr. Edler's declaration. Now, nobody has ever testified whether there was, in fact, a video or was not a video. And I think, as Your Honor mentioned... Do you know whether there was? I'm sorry? Do you know whether there was or wasn't? I do not. Do you know? You just don't know? No, I just do not know. And, frankly, even if there were, Appellate's claim is that Mr. Smith somehow ignored this video. And there's absolutely no evidence that Mr. Smith was aware of the video, had access to a video, and purposefully decided not to review the So he would have to present some evidence that, whether Mr. Smith was right or wrong, sloppy or thorough, that his decision was guided by racial animus. And there's just absolutely no evidence of that on the record. Well, could he rely on the fact that Amtrak can't seem to remember anything about this case? I'm sorry, I didn't hear you, Your Honor. Couldn't he rely on the fact that Amtrak employees can't seem to remember anything about this case? Like, was there a video? Who was involved in the Ebersol waiver? Right? No, respectfully, Your Honor. I would disagree with that. Because there has to be actual evidence of race discrimination. And this Court in Brady... No, there doesn't. That's not what the law is. You don't have to have action. You can rely on circumstantial evidence. That's what Brady's all about. With respect, Your Honor, I think what Brady says is that the Appellant here cannot just simply survive summary judgment by saying, well, I happen to disagree with the old law of pro bono. Well, you're totally right about that. But can't you draw inferences from a defendant's inability to remember key facts about a case? No, Your Honor. No? Respectfully, I believe you cannot. The jury cannot make the logical connection between somebody's inability to remember something five years after it occurred and race discrimination. And again, he has chosen to focus this case on Mr. Smith. And so whether Mr. Pesch or Mr. Sherlock can remember what occurred, whether there was a videotape or not, none of this is any evidence of race discrimination whatsoever. If Pesch and Sherlock think they probably would have been the person to be involved in Ebersole's waiver, aren't they, by the same token, probably the people that made the decision on Burley's waiver? Your Honor, I think you actually have the facts backwards. But the answer to that is no. There is absolutely no evidence that they would have been involved in Mr. Ebersole's waiver. Again, we have very different situations. We're talking about a derailment. In that derailment, it was undisputed that Mr. Burley and Mr. Burley alone was on the waiver. Mr. Pesch and Mr. Sherlock believe that one of the two of them would have been involved. And in fact, Mr. Pesch in his deposition said, given the nature of this case, I would have been at least involved in that decision. But whether Mr. Pesch and Mr. Sherlock made the right decision or the wrong decision about Mr. Burley's waiver, it's undisputed in the record that neither of those gentlemen knew Mr. Burley's race. So even if they were wrong, even if they overreacted here, again, this is a race discrimination claim. And so the very fact that they don't know Mr. Burley's race would preclude any reasonable jury from finding that they denied him a waiver because of his race. And now, the appellate attempts to sort of get around that, what we would submit as the fact that it's fatal to his case, by saying, well, it was Mr. Smith who made these decisions. But I think, as Your Honor correctly noted, there's no record in the evidence that Mr. Smith had any involvement in the waiver. In fact, the only record evidence is that Mr. Smith denied that he was involved. And in fact, at his deposition, he was never even asked if he was involved in Mr. Ebersole's waiver. So, you know, whether or not it was fair or just that Amtrak denied Mr. Burley's waiver, there's simply no evidence on the record that would show that it's discrimination. Now, because it's undisputed that Mr. Pesch was the person who terminated Mr. Burley, and it's undisputed that Mr. Pesch did not know Mr. Burley's race at the time he made that termination decision, appellate is trying to make this into a cat's paw case. And we would submit that his doing so is a misapplication of the Supreme Court's decision in Staub v. Proctor Hospital. And that case is readily distinguishable from this case, because in Staub, which is a USERRA case, there was direct evidence that the so-called real decision maker, not the de facto decision maker that the hospital was trying to rely on, but the, quote, real decision maker, had actually evidenced some animus towards Mr. Staub's military service. In this case, the appellant argues that Mr. Smith was the, quote, real decision maker. And there is, again, absolutely no evidence, no statements by Mr. Smith, no conduct by Mr. Smith, nothing that any reasonable jury could find that Mr. Smith was the motivatory animus. So whether Mr. Smith was right, whether Mr. Smith was wrong, whether his investigation was sloppy, whether he should have reviewed a videotape or not, the question is, could a reasonable jury find that he was motivated by racial animus? And we respectfully submit the answer to that is no. Now, my colleague on the other side discussed sort of questioning Amtrak's business judgment. And that's exactly what this case is really about. Because as this case in Brady held and in Fischbach and many others, it's not the federal judiciary to stand as a super personnel department, in the words of this court, to micromanage everyday employment decisions. And so if he's going to challenge Amtrak's business judgment, he bears the very heavy burden of saying that Amtrak's decision was based on errors that were too obvious to be unintentional. Looking at the undisputed facts in this case, he has to demonstrate that Amtrak's decision that Mr. Burleigh was responsible for derailing that engine was either not honestly held or unreasonable. Now, he doesn't allege that that decision was not honest. Well, those cases articulate the similarly situated employee being treated differently as a way to show pretext. And that seems to be what they're really resting a lot of their case on here. So I take your point as to the broader issue, but they do seem to be trying to fit their case within that Ebersole was similarly situated and got less severe sanctions. So that seems to be what the case boils down to, at least as the plaintiff has portrayed it here. And certainly, let me address the similarly situated aspect of this case. So, again, because this court can't sit as a super personnel department, the two individuals need to be similarly situated in all material respects, which this court has interpreted to mean they need to be nearly identical in all relevant aspects of their employment. The focus of his argument is that Amtrak somehow treated Mr. Burleigh and Mr. Ebersole differently with respect to the derailment. And so we pose that there are two major reasons why Mr. Ebersole is not similarly situated. First and foremost, this is a train derailment. And it's undisputed that Mr. Ebersole was not on the train at the time. There's no dispute that Mr. Burleigh was the only person who physically moved that train. If under Amtrak rules, isn't the conductor ultimately responsible for the train? Your Honor, the conductor is ultimately responsible for the train when he is on the train. But it's undisputed that Mr. Burleigh was the one that was solely responsible given that Mr. Ebersole was not on the train. But if I could sort of address the second point. Yeah, what's your second point? Is it that there's no evidence that Smith was involved in Ebersole's discipline? You're absolutely right, Your Honor. That was a question. I didn't say he wasn't. I asked you whether that is your second argument. That is our second argument. So no reasonable jury could find that Mr. Burleigh was treated differently than Mr. Ebersole because of his race if it was not, in fact, the same person who made those two decisions. And as we've noted, there's absolutely no evidence on the record that would indicate that Mr. Smith But that's because Amtrak can't remember, has no recollection of who did it. Well, the one That's why I asked you the question about, you know, I mean, one of the witnesses testified that the waiver decisions were normally made by, what is it? The assistant superintendent or someone above. Smith is an assistant superintendent. Amtrak can't remember who did it. Why can't the jury infer from Amtrak's inability to remember that maybe it was? Because, Your Honor, that would be pure speculation. Because the only record evidence here is that Mr. Smith said he didn't make the decision. But Amtrak has failed to show, I mean, Amtrak has Amtrak has the ability to tell us who was involved. Doesn't it? I have sort of two responses to that, Your Honor. First and foremost, I don't think Amtrak bears the burden here. Because under the sort of burden-shifting framework, Amtrak's burden was to come up with So if I say, so if there's a rule that If there's a rule that decisions are made by either A or B, that's the rule. Okay, and A, A is one of the people, and we don't know whether B did it. And the defendant says, well, we don't remember who did it. Why can't the jury infer that, well, they're the defendant? That's pretext. Well, first, Your Honor, you're speaking about the testimony of Zach Pink. I'm talking about Smith, yeah. He said it's either made by the assistant superintendent or someone above. Smith was the assistant superintendent, right? Correct. Mr. Smith Okay, and Amtrak can't remember. That's all we've got. Well, Your Honor, the evidence on the record is that the decision Mr. Smith is clearly one of the people who could have made the decision, and it sort of makes sense that, you know, he was involved in the Burley one. Why wouldn't he be involved in this one? Well, Your Honor, there's absolutely no evidence that Mr. Smith was involved in the Burley one or the Ebersole one. Well, I think, I mean, just looking at, I mean, this is an employer, a common employer with common, you know, priorities and sense of the importance. I mean, you show a great amount of indignation about the seriousness of this particular event, but, you know, the appellant in the brief talks about Caucasian engineers speeding when his locomotive collided with a stop train for $36,000 of damage, and he gets suspended for five days. And, you know, another one who fails a drug test showing cocaine in his urine, and, you know, his train collides with another train, and he gets later disciplined. I mean, there is a pattern where you think at some level these do become relevant. You know, this is out of line with what has been done by a number of different supervisors in a number of different engineer situations with serious damage to property. With respect, Your Honor. And danger to the individuals. I'd like to first address the drug case. Drugs are handled in a very specific way, and this isn't on the record, but drugs are handled in a very specific way under the court of warning. So it's almost impossible to compare a drug case to another case. This involves questions of whether other white engineers can be adequate comparators. But the record evidence on each one of those particular instances is that those individuals were given waivers by either Mr. Sherlock or Mr. Petsch. But it's undisputed, even if those people were adequate comparators, it's undisputed that neither Petsch nor Sherlock knew Mr. Burley's race. And so even if Mr. Burley could meet the technical requirements for a comparator analysis, no reasonable jury could find that those individuals were treated more favorably than Mr. Burley because of Mr. Burley's race, because it's undisputed that Mr. Petsch and Mr. Sherlock did not know Mr. Burley's race at the time that they made any decision. And, Your Honor, I see that I'm out of time. So unless there are any additional questions. No, we have no other questions. I think, did the counsel have any time left? Thank you. Okay, you can take two minutes if you'd like. Mr. Carl, is there any evidence in the record that Smith was aware that Mr. Ebersole was not on the engine at the time that this accident occurred, at the initial time that he made his report? Yes, there was. Number one, there's the disciplinary report that I cited earlier that was given to Ebersole that says you're being charged with jumping off the engine. Secondly, Burley told him. And thirdly, there's an interview with Ebersole that was conducted approximately an hour after the derailment. Did Smith appreciate that Ebersole had never told Burley that he got off? I mean, it seems like the facts, as Ebersole agrees them to be later, render Burley to be not culpable but just kind of snooker. And it's not clear that Smith appreciated that? Yes, that's what Mr. Burley told him. But to go back to the taping system, this is on page 422 of the appendix. So did Smith know that? Did Smith know, because you're putting a lot on Smith, did he know that Burley was unaware that Ebersole had gotten off? Because there's a different level of care. If you know that you're the only person driving, then you've got to take a different level of care if you think your teammate is on there. And I guess since this all gets down to Smith's intent, you need to show that Smith knew that but still treated Burley harshly. What points to Smith knowing that Burley was unaware? Yes, he told him. Yes, Burley told Smith. Burley told Smith right away? Yes. And he testified and where's that? Where should I look in the record for that? I'll find out, Your Honor. Okay. With respect to the question about the taping system, I don't want to belabor this, but this is Bernard Campbell's deposition. Campbell is one of the people on the investigation committee. On page 422 of the appendix, he says Dave Smith would definitely have looked at the tapes. Okay. With respect to the question about what's Smith's tie in here, Tingley says he took the request to Smith. Adler, the union rep, says he talked to Smith about the waiver. So for Smith to say he doesn't remember is a sort of testimony that, when it's considered with all the other testimony, the jury certainly might not believe. Now, from the point of view of what happened in the accident or what happened in the derailment. . . Could you finish up your sentence? Okay. Direct evidence is not required. There's a disputed fact as to what really happened. And this court's decision in Primus v. D.C. is that that's why you have a jury to sort all this out. Okay. Thank you. Case submitted. Thank you.
judges: Tatel, Kavanaugh, Pillard